# In the United States Court of Federal Claims

No. 21-2165
(Filed: June 26, 2025)

```
* * * * * * * * * * * * * * * * * *
                                  *
JOSEPH L. WARNEMENT,              *
                                  *
                    Plaintiff,    *
                                  *
        v.                        *
                                  *
THE UNITED STATES,                *
                                  *
                    Defendant.    *
                                  *
* * * * * * * * * * * * * * * * * *
```

*Timothy L. Jacobs* and *Jennifer Potts Seybold*, Hunton, Andrews, Kurth LP, of Washington, D.C., for Plaintiff.

*Katherine R. Powers*, Trial Attorney, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, and *Mary M. Abate*, Of Counsel, Tax Division, U.S. Department of Justice, all of Washington, D.C., for Defendant.

## ORDER AND OPINION

**SOMERS**, Judge.

This case concerns Plaintiff Joseph L. Warnement's claim for a refund of federal taxes and associated interest from the Internal Revenue Service ("IRS"). In May 2016, Plaintiff was assessed with penalties under 26 U.S.C. § 6672 based on his association with INgage Networks, Inc. ("INgage"), a now defunct software and consulting company that was based in Naples, Florida. Over seven tax quarters, between July 2012 and March 2014, INgage failed to remit to the IRS federal income and social security taxes, known as trust fund taxes, that it was responsible for withholding from its employees' paychecks. The IRS assessed a penalty against Plaintiff on the grounds that: (1) based on his role at INgage, Plaintiff had a duty to remit the taxes on behalf of INgage; and (2) Plaintiff willfully failed to remit the taxes owed by INgage because he was aware of the delinquency and paid other creditors before the IRS.

In response to Plaintiff's complaint, the IRS answered and counterclaimed, seeking payment for the full amount of the trust fund taxes owed by INgage over the seven quarters at issue. Thereafter, the government moved for summary judgment on the grounds that Plaintiff both had a responsibility to remit the taxes owed and that he willfully failed to do so. For the

reasons that follow, the Court grants in part and denies in part the government's motion for summary judgment.

**BACKGROUND AND PROCEDURAL HISTORY**

INgage was founded in 1999 as a computer software and consulting service as well as a social media platform, with customers that included American Express, Kodak, and Adidas. *See* ECF No. 1 ¶ 17; ECF No. 56-1 at 5–6. Headquartered in Naples, Florida, the company was founded by a group of investors whose generous capitalization largely financed daily operations and helped grow the company to fifty-one employees by 2012. ECF No. 62-2 ¶ 16; ECF No. 56-1 at 80. Beginning in 2011, the company began to suffer from serious financial distress after its primary customer, American Express, terminated one of its biggest contracts, which accounted for the majority of INgage's total revenue. ECF No. 1 ¶ 20; *see also* ECF No. 56-4 at 9 (Pl. Dep. 25:4–6); ECF No. 56 at 5. In response, the INgage board of directors ("the board") hired consultants, including Plaintiff, to help right the company's financials and regain the American Express contract. ECF No. 56 at 5 (citing ECF No. 56-4 at 9 (Pl. Dep. 24:24–26:8, 24:3–13)).

## A.    Plaintiff's Involvement with INgage

Plaintiff was first brought into INgage at the end of 2011 as a consultant at the behest of the then–Chief Financial Officer ("CFO"), Robert Wilson, who had himself been brought into INgage as a consultant a few months prior.[1] ECF No. 56-4 at 9 (Pl. Dep. 25:19–26:3); ECF No. 62-1 ¶ 54. Plaintiff, a graduate of Princeton University and the Wharton School of the University of Pennsylvania, who had worked in management consulting prior to leading several communications and technology startups, characterizes his involvement with INgage during that three-month period as a part-time role, in which his goal was to revive contract negotiations with American Express and attract new business. ECF No. 56-2 at 278–79; ECF No. 56-4 at 11 (Pl. Dep. 30:4–20, 31:2–33:1). Soon after Plaintiff began consulting with the company, tensions arose between Wilson and INgage's co-founder, its then–President and Chief Executive Officer ("CEO") Kim Kobza, as Wilson was seeking to dramatically reduce employee headcount while Kobza was refusing to make serious reductions in spending. *See* ECF No. 56 at 5; ECF No. 62-2 ¶ 19. Amid the conflict, Wilson resigned from his role as CFO, and the chairman of the board, Don Gunther, sought a new CEO to replace Kobza, with Gunther himself using the titles of "Interim CEO" and "CEO" during the early part of 2012. ECF No. 56-1 at 7; *see* ECF No. 62-1 at 83, 33–34; ECF No. 62-2 at 70, 73–74.

### 1.    Plaintiff's Title

In May 2012, Gunther and two other board members approached Plaintiff to ask him to take on a more formal role within INgage, hoping he might become the new CEO. ECF No. 1 ¶ 23; ECF No. 56-4 at 10 (Pl. Dep. 26:2–29:1), 13–14 (Pl. Dep. 41:22–43:12); ECF No. 56 at 6;

---

[1] Like Plaintiff, Wilson claims that his "actual role with the company was in title only and did not come with the official authority held by a typical company CFO," and thus he "never viewed [his] role at INgage as anything other than as a consultant." ECF No. 62-1 ¶ 25.

ECF No. 62-2 ¶ 26.  Plaintiff, aware of the financial precarity of the company, initially refused to accept any formal title; however, around that time Plaintiff also seems to have anticipated taking on greater responsibility within the company.  ECF No. 56-4 at 14–15 (Pl. Dep. 43:4–47:3); ECF No. 56-1 at 8, 9.  Despite Plaintiff's insistence that he did not sign an employment agreement with INgage until 2016, meeting minutes from May 8, 2012, indicate that the board voted unanimously to add Plaintiff to the board and approve an employment package for "Joe Warnement to be the new CEO of INgage Networks."  *Compare* ECF No. 56-4 at 13 (Pl. Dep. 41:10–11) ("I, technically, didn't sign any employment agreement until like 2016."), *with* ECF No. 56-1 at 12 ("Joseph Warnement was in attendance as our CEO.").  The outcome of these votes was confirmed in an email from Kobza to all INgage shareholders, introducing Plaintiff as his successor, as INgage's next CEO.  ECF No. 56-1 at 25 ("Today it is our pleasure to announce that we have a new CEO of INgage Networks – Joe Warnement.").

Starting in May 2012 through 2015, Plaintiff held himself out as CEO of INgage Networks.  He used the title of "CEO" in nearly every relevant context: in his email signature block, ECF No. 56-1 at 164–74 (beginning his signature block with "Joseph L. Warnement/CEO, INgage Networks," starting in June 2012), *id.* at 167–68 (same signature block in 2013), *id.* at 173, ECF No. 56-3 at 93–94 (same signature block in 2014); on INgage's website, ECF No. 56-2 at 193 (listing INgage "Executive Team" member, "Joe Warnement, Chief Executive Officer"); on his personal LinkedIn page, *id.* at 278 (listing Plaintiff as CEO of INgage, "May 2012– Present" as captured in March 2014); on business cards, ECF No. 56-1 at 178 (reading "INgage Networks, Joseph 'Joe' L. Warnement/Chief Executive Officer"); in board meeting minutes, *id.* at 12 (citing Plaintiff as "in attendance as our CEO" on May 8, 2012), ECF No. 62-2 at 102–03 (listing as an agenda item, "External Director + CEO Only Session (Don Gunther/Joe Warnement)"); on letters, ECF No. 56-1 at 175 (signing a letter to potential client as "Joe Warnement CEO"); in depositions while under oath, ECF No. 56-2 at 204 (Joseph Warnement Dep. at 3:18–20) ("Q: You're president of INgage Networks, Inc.?  A: Chief executive officer."); on signed demand notes and security agreements, ECF No. 56-4 at 466–79, 481–89 (signing nearly fifty demand notes between June 2012 and May 2015 with "Name: Joe Warnement, Title: CEO"), *id.*  at 495–511 (signing security agreements with a lender on behalf of INgage as "Joseph L. Warnement, Chief Executive Officer"); on organizational charts, ECF No. 56-2 at 110 (placing "Warnement, Joe CEO" in an organizational chart under "Board of Directors" and above all others at the company as of December 31, 2012), ECF No. 56-1 at 52 (same placement in organizational chart as of February 19, 2013); on meeting slides and pitch decks, ECF No. 56-2 at 136, 151, 171, 190 (ending pitch decks with a slide of presenters that reads "Joe Warnement CEO" throughout 2013 and 2014); in the employee handbook, *id.* at 7 (beginning with a letter from "Joe Warnement, CEO"); in correspondences with the IRS, ECF No. 56-1 at 176 (signing a letter to an IRS agent in April 2014 as "Joseph Warnement CEO"); and even on a Form 4180 reporting INgage's trust fund tax obligations during the period in question, ECF No. 56-2 at 294 (listing "job title" as "Company 'President' as of July 1, 2012" on Form 4180 reporting INgage's trust fund tax obligations for August 2012), *id.* at 295 (listing his position in the company as "Pres. and Director").[2]  *But see* ECF No. 62-2 ¶ 80 (claiming that the original

---

[2] The Court also takes judicial notice of the fact that Plaintiff held himself out as the CEO of INgage to the state of Florida in a filing with the Florida Department of State, which he

drafts of some of these documents said "President (in waiting)" or put president in quotes to reflect the lack of employment agreement and status as an officer).

Although he held himself out as CEO in many contexts and others referred to him as CEO as early as 2012, Plaintiff maintains that he did not officially accept the title until he signed an employment agreement in 2016. ECF No. 56-4 at 20 (Pl. Dep. 67:25–68:1) ("[W]as I officially the CEO[?] [N]o."). Plaintiff insists that, aware of the company's financial situation and hoping to avoid any associated liabilities, he declined to sign any agreement prior to February 2016, choosing instead to remain a consultant. ECF No. 62-2 ¶ 36 ("I never accepted or signed the [board's May 2012] offer of employment . . . . As a result, my consulting agreement continued in effect, and I functioned as a consultant . . . ."). *But see id.* ¶ 38 ("After signing the commitment letter, I technically became an employee of the company and went on the payroll as of June 2012."). Plaintiff claims that when he was called CEO, he "repeatedly clarified that he was not CEO," instead "refer[ing] to himself as 'Executive in waiting' or 'President in waiting.'" ECF No. 62 at 6 (citing Plaintiff's own declaration and two April 2012 emails Plaintiff sent, ECF No. 62-2 at 82, claiming he could not "'bind' the Company," *id.* at 92, saying that he was "not officially the CEO of INgage," at the time).

Plaintiff's theory is supported by the contention that "INgage did not operate like other companies, particularly given the small size of the company and significant degree of oversight exercised by the Board and its major shareholders in every aspect of operations," and because of that, the CEO responsibilities—and, by extension, the CEO title and role—were controlled by Gunther and Robert "Bob" Claussen, the secretary of the board. ECF No. 62 at 7; *see also id.* at 5, 4. Plaintiff maintains that he simply used the title at the board's request, since INgage "did not have any official CEO" at the time. ECF No. 62-2 ¶ 32. Plaintiff asserts that Claussen and Gunther took "a dominant role in the financial affairs of INgage" and "exercised significant

---

personally signed, listing himself as "President" and "CEO" of INgage Networks as of September 2012. FLA. DEP'T OF STATE: SUNBIZ.ORG DIV. OF CORPS., *Foreign Profit Corporation: INGAGE NETWORKS, INC.*, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=INGA GENETWORKS%20F990000060591&aggregateId=forp-f99000006059-c71534b9-7a0d-4104-93b6-74c5cb70cd46&searchTerm=INgage%20networks&listNameOrder=INGAGENETWOR KS%20F990000060591 (last visited June 24, 2025) (viewing the September 24, 2012 filing labeled "Amendment" under "Document Images") (listing Plaintiff as "P, CEO" on an amendment received on September 24, 2012 and the same in other filings from 2012, 2013, and 2014); ECF No. 56-4 at 446–47 (admitting in unrelated litigation that "in a filing submitted to the Florida Department of State Division of Corporations on September 24, 2012, Joseph L. Warnement was listed as President and CEO of INgage Networks," and admitting the same for subsequent filings through 2013 and 2014); *see also* FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988) ("Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdiction." (citing *Brown v. Piper*, 91 U.S. 37, 42 (1875)).

control over the Naples office," such that "the day-to-day decision-making and actual control over INgage's cash flow and disbursements resided with Gunther and Claussen—and not with [Plaintiff]." ECF No. 62 at 4, 7. Plaintiff's responsibilities were instead "limited to sales, marketing, and securing funding." *Id.* at 6. Plaintiff supports this claim by asserting that he "was not officially in the role of CEO because [he] did not have an employment agreement and [his] authority was limited by the Board and [he] acted only at the direction of the Board." ECF No. 62-2 ¶ 50.

### 2. Plaintiff's Authority

Although Plaintiff may have been called "CEO" and may have been performing many of the duties typically associated with a CEO, Plaintiff claims that he only had as much authority as the board allowed him. ECF No. 62 at 7, 6; ECF No. 62-2 ¶ 34; ECF No. 56-4 at 20 (Pl. Dep. 67:19–23); ECF No. 62-3 at 425 (Pl. Dep. 247:17–19) ("It was very important to me that people understood it was the Board that was really giving direction on how to get out of this mess."). Plaintiff points to Claussen and Gunther as the final authorities at INgage and asserts that they "were very active in INgage's day-to-day operations because they were resident in Naples, Florida and were present in the Naples office of Ingage [sic] daily." ECF No. 62-2 ¶ 17. By contrast, Plaintiff claims that he "did not have any visibility into the daily operations of INgage because [he] was either in [his] home office in California or traveling on behalf of INgage to secure financing, new investors, or retain customers." ECF No. 62-2 ¶ 54.

Other INgage board members support Plaintiff's assertions that he was not often present in the Naples office and that Claussen and Gunther were actively involved in running INgage's daily operations. Michael O'Brien, a member of the board beginning in 2005 with a background in HR, understood that Plaintiff held the title of CEO, but his primary role was bringing in new business and shoring up the company's finances through attracting investors. ECF No. 62-3 at 228, 232 (Michael O'Brien ("MO") Dep. 18:3–7, 28:2–25), 236 (MO Dep. 46:18–47:12), 240 (MO Dep. 62:19–23). Although O'Brien did not recall the specifics of who was responsible for payroll, he thought "there were others involved, Don Gunther, Bob Claussen, who were on the board [and] . . . lived in Naples, they were pretty active in some of the day-to-day operations." *Id.* at 233 (MO Dep. 33:14–24); *see also id.* at 234 (MO Dep. 34:2–16). To O'Brien, because the company was under financial pressure, specific roles among management became blurred and responsibilities entangled. *Id.* at 235 (MO Dep. 36:4–25). Similarly, William "Bill" Shroeger, another board member who became involved with INgage around 2011 with a background in accounting, characterized Plaintiff as CEO "by title, because [he didn't] think [Plaintiff] ever had an employment agreement." *Id.* at 282 (William Shroeger ("WS") Dep. 33:11–15). Shroeger viewed Plaintiff as someone hired foremost to seek funding to recapitalize the struggling company. *Id.* at 287 (WS Dep. 52:4–22). Shroeger understood that Plaintiff was "always on the road out talking to equity firms," so Plaintiff was "hardly ever" in the office. *Id.* at 288 (WS Dep. 54:16–21). By contrast, Shroeger knew Claussen and Gunther to have been regularly present in the Naples office, active in daily management. *Id.* at 301 (WS Dep. 105:6–25), 312–13 (WS Dep. 166:24–167:12). Likewise, David Kolan, a board member from the company's founding until 2014 and a Certified Public Accountant, stated that he understood Gunther and Claussen to be involved in the daily operations, such as in determining payroll issues. *Id.* at 137 (David Kolan ("DK") Dep. 57:12–14), 120 (DK Dep. 30:14–20), 141 (DK Dep. 65:10–17), 155–

56 (DK Dep. 134:23–135:4), 159 (DK Dep. 148:4–21). Emails from Claussen around 2014 further support the fact that he was spending time overseeing daily operations from within the office. ECF No. 62-2 at 229 (Claussen discussing spending time in the office and feeling close to employees); *id.* at 287 (Claussen asking for a more formal role within INgage to reflect the time spent in the office overseeing operations).

Several employees working under Plaintiff, however, characterized Claussen and Gunther's roles in the day-to-day operation at INgage differently. Lori Bacon, the Senior Director of Administration, who worked directly under Plaintiff, testified that Plaintiff was heavily involved in daily operations, whereas from her perspective, Gunther was rarely, if ever, in the office and did not have any authority over the day-to-day running of the office. *See* ECF No. 56-4 at 282 (Lori Bacon ("LB") Dep. 171:5–172:1). Bacon also stated that Claussen was in the Naples office regularly, but that she and other employees never went to him with questions, turning instead to Plaintiff. *Id.* at 276 (LB Dep. 149:15–16) (describing Claussen's activities at the office as "playing solitaire," coming in because "it got him out of his house"), 295 (LB Dep. 223:22–224:15). Likewise, Christine Richards, a department manager at INgage, stated that as far as she could tell, Claussen was not involved in day-to-day operations and did not supervise any employees. *Id.* at 216 (Christine Richards ("CR") Dep. 149:6–17). Similarly, she "would see [Gunther] around the office occasionally when he would stop in, you know, for board meetings, shareholder meetings," and he "would occasionally say hello to employees that he knew or worked with," but around the office he was "kind of a cheerleader." *Id.* at 198 (CR Dep. 74:5–75:11).

Beyond mere presence at the Naples office, testimony from board members and employees conflicts as to whether Plaintiff had authority independent of the board. Shroeger flatly denies that Plaintiff acted only at the direction of the board. ECF No. 62-3 at 307–08 (WS Dep. 140:25–141:8) ("Q: So this letter says that Mr. Warnement acted under the direction of the board. I mean, what did—is that accurate? A: Not this guy . . . basically he held a gun to our head, to Gunther's head, to make him write [that]."). On the other hand, Kolan affirms that Plaintiff was given the CEO title merely to help attract new customers and raise capital, but Claussen and Gunther were, in fact, in charge of daily operations and final decision-making. *Id.* at 128 (DK Dep. 39:13–22), 157–58 (DK Dep. 146:1–147:13), 155–56 (DK Dep. 134:23–135:4), 159 (DK Dep. 148:4–21). Somewhere in the middle, Richards characterized Plaintiff as acting "in concert with the board and the board was in concert with what the CEO was recommending." ECF No. 56-4 at 216 (CR Dep. 146:21–23).

Plaintiff supports the assertion that his role as merely advisory, with the board retaining ultimate authority, by illustrating the responsibilities he had and how they were overseen by Claussen and Gunther. ECF No. 62-2 ¶¶ 53, 75. Although it appears as though he authorized disbursements of funds, Plaintiff disputes that he had any involvement "in the payroll calculations" or "in the interactions with vendors and other parties," and claims that even though he could authorize credit card payments to vendors, he "generally never looked at vendor invoices." *Id.* ¶ 53. While Plaintiff had the power to authorize and block disbursements, he "did not view [his] role as one of approval or disapproval, or one of allocation or reallocation." *Id.* Plaintiff underscores his repeated recommendations to the board to address the payroll tax liabilities that INgage had been accruing, which he claims they largely dismissed. ECF No. 62 at

7–8 (citing Plaintiff's own declaration).  Plaintiff points to Claussen and Gunther as the ultimate authorities who approved disbursements, ECF No. 62-2 ¶ 39; allocated payment priorities, *id.* ¶ 53; wrote and signed checks, *id.* ¶ 54, *id.* at 1364–1688; primarily communicated with the IRS regarding tax matters, *id.* ¶¶ 59, 60, 85; managed cash flow and disbursements, *id.* ¶¶ 78, 86; and oversaw the day-to-day affairs within the Naples office, *id.* ¶¶ 57, 118.  Additionally, Plaintiff points to one instance in April 2014, in which he explicitly directed Bacon to "forward monies for one payroll to IRS immediately," but he states that he was directed to stop the payment by Gunther and Shroeger.  *Id.* ¶ 72; ECF No. 56-3 at 60.

Other evidence in the record supports Plaintiff's claims that he acted with limited authority, as allowed by the board.  For example, in 2016, while determining who had authority to sign a settlement agreement amid litigation in which INgage was a defendant, "INgage's position [was] that Mr. Warnement's signature is not effective," as the "the transfer of value [was] above [Plaintiff's] expenditure limit without prior authorization."  ECF No. 62-2 at 145, 148.  Ultimately, INgage's attorneys determined "INgage is fine with both Mr. Warnement and Mr. Gunther executing the document, as long as all parties understand it is INgage's opinion that Mr. Warnement does not have the necessary signing authority to bind INgage to the full terms set forth in the Settlement Agreement."  *Id.* at 143.  Plaintiff claims he was provided with only two instances of limited authorizations by the board including binding the company up to $100,000 for the purposes of seeking vendor and service providers.  *Id.* at ¶ 39.  Meanwhile, all other expenditures "had to be approved by the Board and by Gunther and/or Claussen."  *Id.*  Likewise, Plaintiff emphatically underscores that "he never signed any checks" and had no check-signing authority.  ECF No. 62 at 21 (citing ECF No. 62-2 at 543–1688; *id.* ¶¶ 114–15).

The government contends that Plaintiff had more responsibility than he claims.  Although Plaintiff may not have had "signatory authority on many matters" and "could not write checks," ECF No. 56-4 at 20 (Pl. Dep. 67:21–22), the government claims that he was still approving, directing, and prioritizing the disbursement and withholding of INgage's funds beginning in 2012, ECF No. 56 at 27.  For example, Plaintiff approved the use of a company credit card to pay a vendor, ECF No. 56-3 at 6; halted payments to a company attorney, opting instead to wait to pay until more cash would be available, ECF No. 56-2 at 297; directed the allocation of funds through the company's comptroller, ECF No. 56-4 at 30 (Pl. Dep. 106:2–107:5); signed and approved contracts on behalf of the company, *id.* at 31 (Pl. Dep. 110:8–22); approved payments of specific expenses, *id.* at 248–49 (LB Dep. 37:22–38:3), ECF No. 56-1 at 162–63; authorized disbursement of the payroll, ECF No. 56-2 at 305, ECF No. 56-4 at 249 (LB Dep. 38:4–39:18), *id.* at 225 (CR Dep. 183:6–184:21); fired employees, ECF No. 56-4 at 30 (Pl. Dep. 148:20–21); approved leave for company employees, *see* ECF No. 56-2 at 321, 322; determined employee compensation, *id.* at 319; authorized the cancellation of life insurance policies for key people at the company, ECF No. 56-4 at 33 (Pl. Dep. 120:1–121:16); authorized the issuance of checks, *id.* at 252 (LB Dep. 53:9–11), 253 (55:14–16), 265 (104:17–19, 105:3–5), 266 (106:4–6), 267 (110:20–22); directed payments to be disbursed to specific employees, ECF No. 56-2 at 312–13, ECF No. 56-3 at 90–91, *id.* at 87–89 (including payments to himself); and signed loan agreements and guarantees on behalf of the company for over $4 million, ECF No. 56-4 at 466–479, 481–89, 495–549.  Plaintiff disputes these claims, stating that each instance in which he directed payment, he was "acting under the direction of the

Board," per the "very limited authorization given to him by the board," which required express grants of permission.  ECF No. 62 at 21.

## B.    INgage's Payroll Difficulties

Starting in early 2012, INgage suffered from a "drastic downturn in business" that led to changes to the payroll.  ECF No. 62-2 at 206.  Until late 2012, INgage contracted with Automatic Data Processing, Inc. ("ADP"), an external human resource and payroll management service, to process all employee paychecks and transmit all necessary payroll taxes to the IRS.  ECF No. 56-4 at 34 (Pl. Dep. 125:22–25); *id.* at 370 (Gwen Nugent ("GN") Dep. 63:3–14) ("[N]ormally I would process the payroll and then two days later the tax withholding would be pulled from INgage's bank account, and then transmitted through ADP to the tax authorities.").  INgage's Corporate Comptroller, Erin McKone, who reported directly to Plaintiff, worked regularly with ADP to ensure that payroll was met monthly.  *Id.* at 251 (LB Dep. 46:4–10); ECF No. 56-2 at 297.  On July 6, 2012, McKone resigned after INgage "missed the last payroll funding with ADP" and transitioned "to a pre-paid basis," which required it to wire money to ADP before a given deadline every other week for payroll to be paid out on time.  ECF No. 56-1 at 29, 30.  After McKone resigned and INgage transitioned to a pre-paid basis with ADP, Bacon took over administering payroll and other outstanding expenses and reported directly to Plaintiff.  *Id.* at 34–39.  Between May and September 2012, Bacon would notify Plaintiff of operating expenses and payroll deadlines and amounts, for which Plaintiff would then authorize disbursement of funds.  ECF No. 56-4 at 225 (CR Dep. 183:6–184:21); ECF No. 56-2 at 305 (Christine Richards, a department manager at INgage: "Joe, just wanted to say thank you for all your effort to get payroll today . . . ."  Plaintiff: "Thanks christine[.]  But no need to thank me[.]  That's my job . . . .").  *But see* ECF No. 56-4 at 37 (Pl. Dep. 134:23–135:1) ("I thought that Lori [Bacon] and the accounting people managed the ADP process . . . I wasn't close at all to the ADP or payroll process.").

When INgage did not meet ADP's deadlines, employees started to be paid irregularly, and finally after a week-long delay many employees quit or looked for new jobs.  ECF No. 56-4 at 207–08 (CR Dep. 113:18–114:25).  Although INgage had struggled to meet its payroll in the past, employees describe the July 2012 payroll delays as unusual, since previously investors had just given the company cash infusions to keep the employees regularly paid.  *Id.* at 208 (CR Dep. 115:11–116:22).  This transition to a delayed payroll schedule seemed to be due to Plaintiff's decision-making and at his discretion.  *Id.* at 225 (CR Dep. 184:18–21) ("Q: [Paying out payroll] was at Joe's discretion; is that right?  A: Yes, absolutely.  He was making all those calls because he was getting the day to day of all these escalation points."); *id.* at 208 (CR Dep. 116:1–22).  During this time, Plaintiff was aware of, and working to address, the fact that INgage's cash needs well exceeded their available cash and that the company could not afford to pay all its employees.  *Id.* at 24–25 (Pl. Dep. 85:21–86:23).  Plaintiff states that he, Kobza, and David Bankston did not take paychecks because "[t]he company didn't have the money to pay senior executives."  *Id.* at 25 (Pl. Dep. 86:15–16).  Meanwhile, Plaintiff coordinated with other board members, such as Gunther and Sam Eyde, to provide INgage with short-term funding to meet immediate payroll deadlines.  *Id.* (Pl. Dep. 86:24–87:15).  Plaintiff would also direct Bacon and Richards to pay specific employees backpay.  ECF No. 56-2 at 312–13, 316, 318.

In September 2012, Gwen Nugent, a member of the HR team, who reported directly to Plaintiff, started working to maintain INgage's contract with ADP despite their delayed payments. ECF No. 56-1 at 36; ECF No. 56-4 at 371 (GN Dep. 68:4–20). On September 17, 2012, Nugent sent Plaintiff a letter, which was emailed to him by Bacon, to alert him of the risks of losing ADP as a payroll processor due to their continually late payments. ECF No. 56-1 at 37–38. Therein, Nugent spelled out, in no uncertain terms:

> I spoke with ADP this morning[] and have managed to hold off the cancellation of our payroll account with them only if we process a payroll through ADP this week . . . . I cannot stress strongly enough the consequences of our failing to do this. If we do not process through ADP we will be forced to file our federal and all state taxes manually, which I believe could very likely flag the company for an audit, and at which point we will be facing the following legal and financial obligations:
>
> . . . .
>
> **Taxes –** There are four types of employment taxes–two are "trust fund" taxes and two are "non-trust fund" taxes. The trust fund taxes are employee federal income taxes and the 50% share of FICA taxes an employer must withhold from employee wages. . . .
>
> The employee tax delinquency is a double-edged sword. In addition to imposing stiff penalties and interest on delinquent employment taxes, under Internal Revenue Code section 6672 the IRS can assert personal liability (generally known as the 100% trust fund recovery penalty) for the trust fund portion of the delinquency on any and all responsible persons. A responsible person is anyone who has the power to ensure the trust fund taxes are paid on time.

*Id.* at 38 (emphases in original). The next morning, Plaintiff responded that he had received Nugent's message.[3] *Id.* at 39. Five days later, Nugent resigned from INgage after failing to receive her paycheck, and Bacon became the sole person responsible for HR and payroll management. *Id.* at 40–42. Around that time, INgage lost its contract with ADP for failing to timely pay, and Bacon became responsible for "manually" administering payroll: maintaining a ledger for employee wages, calculating pay and tax withholdings, hand-writing checks for the amounts owed, and signing all checks—which was done by either Bacon or Claussen. ECF No. 56-4 at 31–32 (Pl. Dep. 110:9–114:12); ECF No. 56-2 at 334; ECF No. 62-2 at 563–1688.[4]

---

[3] Plaintiff attempts to argue that he did not understand Nugent's email: "This was . . . Chinese to me . . . . So, when they started talking about trust funds and things like that, I just said I don't know what that is." ECF No. 56-4 at 35 (128:16–20). The government retorts that Plaintiff cannot be as ignorant as he claims, as a degree holder from the Wharton School with decades of business experience. ECF No. 56 at 11.

[4] Plaintiff claims that once the contract with ADP lapsed, "that's when the girls in the office [Bacon and McKone] stepped forward and said, we think we can handle it manually." ECF No. 56-4 at 31 (110:25–111:2). However, Bacon clearly stated in repeated emails to

Bacon claims that as of September 2012, Plaintiff was in charge of authorizing the checks via QuickBooks, a commercially available accounting software for managing payroll, and that INgage was not only putting aside but remitting to the IRS at least some portion of the taxes owed. ECF No. 56-4 at 262 (LB Dep. 91:12–93:1); *see also* ECF No. 56-1 at 44.

Plaintiff claims that he was uninvolved in the payroll process and that Bacon only "technically" reported to him, in the sense that she was directly below him in the company's organizational charts. ECF No. 56-4 at 32 (Pl. Dep. 115:9–116:19); ECF No. 56-1 at 52. When Bacon would send Plaintiff monthly emails with tallies of the total amounts payable to employees and other bills that required payment or approval, ECF No. 56-1 at 43–49, Plaintiff viewed these as Bacon simply "looking for a sounding board to make sure what she was doing was consistent with what she thought that [he] had heard from the board of directors or from Don Gunther . . . ." ECF No. 56-4 at 32 (Pl. Dep. 115:3–7). Yet, beginning in September 2012, Bacon would send Plaintiff cash schedules that reflected accruing quarterly taxes in the "liability bucket." ECF No. 56-3 at 16 & Ex. 87 (September 2012); ECF No. 56-1 at 45 & Ex. 23 (December 2012), 47 & Ex. 24 (January 2013), 49 & Ex. 25 (February 2013); ECF No. 56-3 at 33 & Ex. 97 (March 2013), 37 & Ex. 100 (mid-April 2013); ECF No. 56-1 at 69 & Ex. 28 (end of April 2013); ECF No. 56-3 at 39 (July 2013), 41 & Ex. 103 (September 2013); ECF No. 56-1 at 154 & Ex. 40 (early October 2013); ECF No. 56-3 at 44 (mid-October 2013); ECF No. 56-1 at 156 & Ex. 41 (November 2013), 158 & Ex. 42 (December 2013), 160 & Ex. 43 (January 2014). Plaintiff posits that he either did not open the spreadsheets or was unaware of what "liabilities" meant—whether they were past or present—focusing instead on the summary emails from Bacon, to which the spreadsheets were attached. ECF No. 62-2 ¶ 73. He attributed the decision not to pay the taxes to someone "in the Naples office (likely by Gunther and/or Claussen)." *Id.* ¶ 74.

## C.    INgage Stops Remitting Trust Fund Taxes to the IRS

Plaintiff states that in February 2013, while reviewing 2012 year-end financials, he discovered that INgage's trust fund tax liability "had swelled from [$]110 [thousand]—[he] thought it was up to [$]130 [thousand]—up to [$]314 [thousand]."[5] ECF No. 56-4 at 44 (Pl. Dep. 163:3–4); ECF No. 62-2 ¶ 75. Plaintiff claims that when he had discovered the increase in liability, he "just about lost a gasket," and that was when his "personal risk antenna really rose, and [he] went to the Board." ECF No. 56-4 at 44 (Pl. Dep. 163:5–6). On February 19, 2013, Plaintiff presented to the board at its monthly meeting, using a slide that read "2012 Employee

---

Plaintiff that she required his help and that she was struggling to maintain the ledger and calculate withholdings. *See, e.g.,* ECF No. 56-1 at 40, 42, 43 ("With Gwen's departure, I am not sure what needs to be done, so I am going to need help!!"), 44 (signing an email with questions about payroll and disbursements with "Can you help me out on this").

[5] Notably, the cash schedule Bacon had sent Plaintiff in December 2012 reflected the payroll taxes owed for the third and fourth quarters of 2012, amounting to $403,502 and revised them in January 2013 to amount to $313,982. *See* ECF No. 62-1 Ex. 23 (adding the amounts listed in the summary page cells I:92 and I:93, reading "Q3 Taxes: $108,152" and "Q4 Taxes: $295,350"); *Id.* Ex. 24 (adding the same summary page cells this time reading "Q3 Taxes: $108,152" and "Q4 Taxes: $205,830").

Tax = $314k" and "2013 Employee Tax = $154k." ECF No. 56-1 at 56, 20; ECF No. 62-4 at 173, 108. Plaintiff claims that after the presentation, Gunther and Shroeger said they would "go out and find tax expertise" to address the issue. ECF No. 56-4 at 44 (Pl. Dep. 164:11–14); *see also* ECF No. 62-3 at 397. However, Plaintiff alleges that in that meeting, the board set the priorities for INgage's spending: first, employee benefits were to be paid; second, critical vendors were to be paid; third, employees were to be paid their salaries; and fourth, remaining funds would go to paying down the outstanding trust fund taxes. ECF No. 62-2 ¶ 77. Plaintiff states that he "did not agree with this approach" but "had no authority and no vote." *Id.* Although he "continued to emphasize the need to remain current on the payroll taxes," Plaintiff points to the fact that at the same board meeting, Claussen was voted in as secretary of the board, legitimizing his and Gunther's authority to manage cash flow and disbursements. *Id.* ¶ 78; *id.* at 398. By contrast, Gunther claims that at that same meeting, "the Board suggested that payments to the IRS be made number 1 priority." ECF No. 62-4 at 672. Once Plaintiff had alerted the board of the tax issues, he claims that Gunther, Claussen, Shroeger, and Bacon were handling the issue themselves with the help of an outside accounting firm and a tax attorney. ECF No. 62-2 ¶ 83.

In April 2013, Bacon sent Plaintiff a notice from the IRS stating that it had not received the required Form 941 tax return for the third quarter of 2012. ECF No. 56-1 at 65–68; ECF No. 62-4 at 34–37. In July 2013, Bacon sent Plaintiff an email notifying him that the IRS called about the past four quarters of Form 941 tax returns, which had yet to be filed, in addition to remittance of the taxes owed and asking him for help in addressing these issues. ECF No. 56-1 at 71–74; ECF No. 62-4 at 39–42; *see also* ECF No. 62-4 at 494–95. Also in July 2013, Bacon emailed Plaintiff and Gunther, listing the amounts owed for each of the past four quarters, attaching a letter from the IRS, notifying them that she had spoken with an IRS agent who had underscored that "it is CRITICAL to pay [the payroll taxes owed for] Q2 2013," and asking them to "[p]lease advise." ECF No. 56-1 at 75; ECF No. 62-4 at 44. Thirteen days later, Gunther replied: "This is critical. The IRS payment MUST be made." ECF No. 56-1 at 152; ECF No. 62-4 at 49.

Despite Bacon's messages and the IRS's communications, INgage continued to fail to file Form 941 tax returns and remit trust fund taxes to the IRS for the last two quarters of 2012, all of 2013, and the first quarter of 2014. ECF No. 1 at 27–30. In all, INgage accrued $611,681.55 in unpaid trust fund taxes for the fiscal quarters between July 2012 and March 2014.[6] *Id.* During that time, Bacon continuously emailed Plaintiff with cash schedules that reflected mounting unpaid trust fund taxes. *See, e.g.,* ECF No. 56-3 at 16, 33, 37, 39, 41, 44; ECF No. 56-1 at 45, 47, 49, 69, 154, 156, 158, 160. During that period, INgage made several small payments to the IRS for unpaid taxes "when [they] had the $funds available." ECF No. 56-2 at 355.

---

[6] According to the IRS's ICS History Transcript, that number was revised to $609,681.55 in March 2015 after auditors conducted a revised calculation. ECF No. 62-4 at 598. The government seeks the unpaid penalties assessed, which it calculates as $609,681.55, for the fiscal quarters between July 2012 and March 2014, in addition to assessed and statutory interest as well as costs allowed by law. ECF No. 37 ¶¶ 68, 71.

By early 2014, the IRS had begun investigating INgage regarding the outstanding Form 941 tax returns and unpaid trust fund taxes. ECF No. 62-4 at 489–673; *see also* ECF No. 56-3 at 46–47. An IRS representative regularly communicated with Bacon and Claussen, attempting to impress upon them the importance of remitting the taxes owed. ECF No. 62-4 at 524. Meanwhile, Bacon and Claussen tried to reassure the IRS representative that INgage was working to secure funding to repay the amounts owed and stay current. *See, e.g.*, *id.* at 524, 531, 533, 537–38, 550–51.

In April 2014, INgage began to seriously address its tax liabilities. Shroeger emailed Plaintiff, Bacon, and several board members, telling them that he had contacted an attorney to help navigate the taxes incurred, and he reiterated the following: "TRUST FUND PORTION OF LIABILITY: Failure for the company to pay the Trust portion of the Liability (Employee w/h and FICA), exposes the officers and directors to collection payments, the IRS is not required to apportion the liability equally amongst the O&D . . . ." ECF No. 56-3 at 52–53. Soon thereafter, Plaintiff apprised Shroeger that "we are forwarding the Payroll Taxes today for the initial payroll period in Q2/April and attempt to stay 'current' going forward." *Id.* at 58. Plaintiff and Bacon coordinated the establishment of a biweekly payment plan to remain current on the accruing trust fund taxes for 2014. *Id.* at 92–94; ECF No. 62-4 at 553. INgage also filed all missing Form 941 tax returns for the quarters in question—all of which were signed by Claussen—in July 2014. ECF No. 56-1 at 80–99. By the middle of 2014, INgage was back on track with filing returns for and paying its newly incurred trust fund taxes. ECF No. 62-2 at 491; ECF No. 62-4 at 521. Nevertheless, INgage still failed to remit the trust fund taxes owed for the final two quarters of 2012, all of 2013, and the first quarter of 2014. ECF No. 62-4 at 521–22.

Between 2013 and 2015, the IRS conducted a full investigation into INgage to determine against whom to assess the trust fund taxes for the seven unpaid quarters. ECF No. 62-4 at 549, 559, 561, 564, 567, 569, 574, 596, 613, 621, 642 (attempting repeatedly to interview Plaintiff for a trust fund penalty assessment). Plaintiff received a letter with attached trust fund schedules from the IRS in October 2014 that read: "We are now determining who may be personally responsible for some portion of the tax. We have received information that indicates you have some responsibility for the tax." ECF No. 62-2 at 530. After a two-year long investigation, the IRS issued a recommendation regarding the trust fund recovery penalty for INgage, determining that Plaintiff was a responsible person, as defined by 26 U.S.C. § 6672. ECF No. 62-4 at 665–80. Plaintiff was assessed with the full amount of unpaid trust fund taxes owed on May 30, 2016. ECF No. 56-3 at 107–143. Although INgage entered into an agreement with the IRS to repay the outstanding trust fund taxes in installments, that agreement was terminated in September 2017 and the taxes remain outstanding. ECF No. 62-2 at 209–15; ECF No. 62-4 at 469–70.

Notwithstanding, in January 2016, Plaintiff finally agreed to sign an employment agreement with INgage to "officially" become CEO. ECF No. 62-2 ¶¶ 43–44. Plaintiff states that before signing any agreement, he demanded that the INgage board address the outstanding trust fund taxes by enrolling in and fulfilling a payment plan with the IRS, and he required that they sign a written statement, memorializing the fact that he was not a responsible person during the fiscal quarters in question (referred to as the "tax letter"). ECF No. 62-2 at 206–07; *id.* ¶¶ 44–46. In June 2016, Plaintiff paid the IRS $1,315.45, representing the tax withholdings for

one employee during the seven quarters of unremitted taxes, and he filed seven Form 843 Claims for Refund and Request for Abatement for each quarterly period, totaling $1,315.45. ECF No. 1 ¶ 45; ECF No. 37 ¶ 45. Thereafter, Plaintiff made overpayments to the IRS for his 2016, 2017, and 2018 personal taxes, which the IRS did not refund and instead credited to the outstanding trust fund recovery penalties, totaling around $6,150. ECF No. 1 ¶ 47; ECF No. 37 ¶ 47.

With respect to Plaintiff's involvement at INgage, Plaintiff officially resigned as CEO in March 2017, although he "remained at the Company in a period of transition for a few months" thereafter. ECF No. 62-2 ¶¶ 101, 100; *see also id.* at 528. In 2019, Plaintiff filed appeals on the tax assessments on his personal taxes for 2012, which led to a finding by the IRS appeals officer that Plaintiff was "fully willful and responsible" for INgage's unpaid trust fund taxes during the seven quarters in question. ECF No. 1 at 80; *see also id.* ¶ 46; ECF No. 37 ¶ 46. In October 2021, Plaintiff filed suit, seeking a determination that he is not liable for trust fund recovery penalties under 26 U.S.C. § 6672 and that he is entitled to a refund of his tax payments in the amount of $1,315.45. ECF No. 1 ¶¶ 48–67. The government answered Plaintiff's complaint and brought a counterclaim, seeking judgment against Plaintiff for the penalties from INgage's unpaid trust fund taxes, totaling $609,681.55 for the quarters between July 2012 and March 2014, in addition to assessed and statutory interest and costs. ECF No. 37 ¶¶ 68–71.

In September 2024, the government moved for summary judgment. ECF No. 56. After replete briefing followed by oral argument, the motion is now ripe for adjudication.

## DISCUSSION

### A. Legal Standard

Under Rule 56(a) of the Rules of the U.S. Court of Federal Claims ("RCFC"), the Court must, as a matter of law, "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." Generally, it is the party moving for summary judgment who "always bears the initial responsibility of informing . . . the [C]ourt of the basis for its motion," and who must identify the portions of the record before the Court that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing a former version of Federal Rule of Civil Procedure 56(c)).

Uniquely, the burden of proof in a motion for summary judgment for a case that involves a tax controversy functions differently than other types of motions for summary judgment. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935) ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid."); *see also United States v. Janis*, 428 U.S. 433, 440–41 (1976). With respect to tax cases, once the government has made a prima facie case, "both the burden of going forward with evidence and the ultimate burden of persuasion shifts to the plaintiff." *Potozky v. United States*, 8 Cl. Ct. 308, 315 (1985). For the government to prove its case, it need only introduce its assessment into evidence, as "IRS assessments are entitled to a presumption of correctness." *Michaud v. United States*, 40 Fed. Cl. 1, 15 (1997) (citing *Ghandour v. United States*, 36 Fed. Cl. 53, 59 (1996)). In such cases, "the general rule is that [a] plaintiff must prove by a preponderance of the evidence that he is *not* a 'responsible person' [and *not* 'willful'], and thus [the government's] assessment is erroneous."

13

*Pototzky*, 8 Cl. Ct. at 315 (emphasis added); *see also Noffke v. United States*, 129 Fed. Cl. 341, 355–57 (2016).

Notwithstanding the unique nature of summary judgment burdens in a tax case, a plaintiff can still defeat the motion by making a showing that materials he or she has put before the court, or materials cited by the government, establish a genuine dispute as to whether the plaintiff is a responsible person or was willful in his or her non-payment. *See* RCFC 56(c)(1)(A), (B). Generally, to prevail by demonstrating that a genuine issue for trial exists, the plaintiff "cannot rest on the mere allegations or denials of his pleading," *Banks v. United States*, 62 Fed. Cl. 778, 779 (2004), but instead must "go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions," *Dallin ex. rel. Young v. United States*, 62 Fed. Cl. 589, 596 (2004) (citing *Celotex*, 477 U.S. at 324). In other words, once the government has made its prima facie case, the plaintiff must present "sufficient evidence to raise a question as to the outcome of the case" to survive a motion for summary judgment. *Dallin*, 62 Fed. Cl. at 595.

## B.    Analysis

Several provisions of the Internal Revenue Code require employers to withhold taxes from individual employees' paychecks and remit them to the IRS, "commonly referred to as 'trust fund taxes.'" *Slodov v. United States*, 436 U.S. 238, 243 (1978); *see, e.g.,* 26 U.S.C. §§ 3102, 3402, 7501, 6672. Between their time of collection and remittance to the IRS, these taxes may be permissibly intermingled with an employer's other funds. *Slodov*, 436 U.S. at 243. The Supreme Court has observed that, given this permissible intermingling, such "funds . . . can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Id.* Regardless of whether the employer remits the withheld taxes to the IRS, those taxes are credited to the employee. *Id.*

If an employer "willfully fails to collect" or remit trust fund taxes that are credited to an employee, 26 U.S.C. § 6672 empowers the IRS to impose "a penalty equal to the total amount of the tax evaded" on "any person required to collect, truthfully account for, and pay over" trust fund taxes. "[A]ny person" required to remit such taxes has been termed a "responsible person," *Slodov*, 436 U.S. at 246 n.7, which can "include[] an officer or employee of a corporation, or a member or employee of a partnership" who is under a duty to act, 26 U.S.C. § 6671(b). Effectively, section 6672 permits the IRS to assess the trust fund penalty against any person who: (1) was under a duty to perform, known as a "responsible person," and (2) willfully evaded remitting the tax. *See Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed. Cir. 1984).

As discussed below, the Court finds that Plaintiff has shown that there is a genuine dispute as to whether he was, in fact, a responsible person during the quarters at issue. There can be no doubt that Plaintiff held the title of "CEO of INgage" during those quarters. However, Plaintiff has, by the barest of margins, made a showing that even as CEO, he may not have been a responsible person—someone with the actual authority to remit any part of the money owed. With respect to the second requirement, that if the person was responsible, he or she willfully evaded remitting the taxes owed, Plaintiff has failed to meet his burden. The evidence before the Court shows that Plaintiff was aware of the taxes owed during the quarters at issue and, if he was

a responsible person, he willfully failed to remit them.  The Court will discuss the respective prongs of section 6672 liability in the order presented.

1.    **Responsible Person**

"Responsible person," in the context of section 6672, extends beyond mere "mechanical functions of the various corporate officers." *Godfrey*, 748 F.2d at 1575 (quoting *White v. United States*, 178 Ct. Cl. 765, 770 (1967)).  Instead, the term applies to anyone who is "in fact responsible for controlling corporate disbursements," or, put differently, anyone who has "the final word as to what bills should or should not be paid, and when." *Id.* (emphasis omitted) (first quoting *Pac. Nat'l Ins. Co. v. United States*, 422 F.2d 26, 30–31 (9th Cir. 1970), then quoting *Wilson v. United States*, 250 F.2d 312, 316 (9th Cir. 1957)).  "The issue of whether a person is a responsible individual with ultimate authority under section 6672 is a question of fact . . . ." *Whiteside v. United States*, 26 Cl. Ct. 564, 569 (1992) (citation omitted).

The Federal Circuit has stressed that determining whether an individual is a responsible person is "a test of substance, not form," citing an array of indicia—such as check signing authority, day-to-day fiscal management, the ability to pay or not pay creditors, significant power over voting stock, acceptance of a regular salary, and control over payroll—that, when taken together, generally amount to a finding that a person is "responsible." *Godfrey*, 748 F.2d at 1575–76; *see also Pototzky*, 8 Cl. Ct. at 317.  Other circuit courts have enumerated other indicia, such as whether someone is viewed as a *de facto* boss, *Neckles v. United States*, 579 F.2d 938, 940 (5th Cir. 1978); whether he or she successfully paid the taxes in a different quarter, *Brown v. United States*, 464 F.2d 590, 591 (5th Cir. 1972); whether he or she is the person creditors look to for payment, *Monday v. United States*, 421 F.2d 1210, 1214–15 (7th Cir. 1970); or whether the person managed the internal affairs of the corporation, *Adams v. United States*, 504 F.2d 73, 75–76 (7th Cir. 1974).  Importantly, this factual inquiry is "determined in the totality of the circumstances; no single factor is determinative."  *Gann v. United States*, 121 Fed. Cl. 482, 488 (2015).

A taxpayer may be found to be a "responsible person" based on a showing that he or she has the "final word," which simply means "significant rather than exclusive control over the disbursal of funds." *Adams*, 504 F.2d at 75; *Dudley v. United States*, 428 F.2d 1196, 1201 (9th Cir. 1970).  In cases in which multiple people are involved in controlling corporate disbursements, liability attaches to "'any' responsible persons, . . . not just to the person *most* responsible for the payment of the taxes." *Jenkins v. United States*, 101 Fed. Cl. 122, 132 (2011) (emphasis in original) (quoting *Barnett v. Internal Revenue Serv.*, 988 F.2d 1449, 1455 (5th Cir. 1993)).  In other words, "[s]ection 6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or the closest control or authority over corporate affairs." *Bolding v. United States*, 215 Ct. Cl. 148, 161 (1977); *see also Gephart v. United States*, 818 F.2d 469, 476 (6th Cir. 1987) ("While it may be that [other business partners] were *more* responsible than plaintiff, and exercised *greater* authority, this does not affect a finding of liability against plaintiff.").  Importantly, "[i]nstructions from a superior not to pay taxes do not, however, take a person otherwise responsible under section 6672(a) out of that category." *Salzillo v. United States*, 66 Fed. Cl. 23, 33–34 (2005) (alteration in original) (quoting *Brounstein v. United States*, 979 F.2d 952, 955 (3d Cir. 1992)) (collecting cases).

By contrast, a plaintiff who is in a position of apparent authority within a company may not be a responsible person if they do not have the actual authority to authorize payment or nonpayment of taxes. *Feist v. United States*, 221 Ct. Cl. 531, 539 (1979). For example, those who "perform the merely mechanical function of preparing tax forms, collecting the tax from the wages of employees, and filing the returns" are not considered "responsible" under section 6672. *Id.* The Court must determine whether the person had the actual "power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Godfrey*, 748 F.2d at 1575 (quoting *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir. 1975)). Even if an individual is a director and officer of a corporation during the quarters at issue, he or she may not have sufficient control over financial decision-making to be considered a responsible person under section 6672. *See, e.g.*, *United States v. Lumetta*, No. 72 C 230(3), 1973 WL 526 (E.D. Miss. Mar. 2, 1973); *Haffa*, 516 F.2d at 936. For instance, an individual, despite having "seemingly important titles," could require cosigners to write checks, be unable to determine who should be paid and when, or lack sufficient control over the internal financial affairs of the corporation to be "responsible" for a failure to remit taxes. *Salzillo*, 66 Fed. Cl. at 35 (quoting *Williams v. United States*, 25 Cl. Ct. 682, 684 (1992)) (collecting cases); *see also Haffa*, 516 F.2d at 936. Thus, the "root principle" is that "an individual is not responsible if a third party exercises so much control over the corporate fisc as affirmatively to prevent that individual from effectuating payments to the IRS." *Salzillo*, 66 Fed. Cl. at 35. Accordingly, the Court is tasked with conducting a fact-specific inquiry into whether the individual had actual authority, not merely apparent authority, to direct payment of funds in a way that was not significantly circumscribed by another authority.

In this case, Plaintiff has met his burden of showing that a genuine dispute as to material facts exists by rebutting the government's prima facie showing that he had actual authority to remit the taxes owed. This finding is based on the evidence Plaintiff has put before the Court, including "affidavits, depositions, answers to interrogatories and admissions," as well as emails and other documents. *Dallin*, 62 Fed. Cl. at 596. To be sure, the government has shown, and Plaintiff has failed to rebut, that he held a "seemingly important title[]" at INgage, regularly holding himself out as CEO starting in 2012. *Williams*, 25 Cl. Ct. at 684; *see, e.g.*, ECF No. 56-1 at 12; *id.* at 164–74; ECF No. 56-2 at 278; *id.* at 294. Plaintiff held himself out as CEO to the public, to government agencies including the IRS and the Florida Department of State, and to the employees of INgage. *See supra.* The overwhelming proof that Plaintiff held himself out as CEO is one of multiple possible indicia that must be linked together to imply "the existence of the requisite authority or power." *Salzillo*, 66 Fed. Cl. at 35. Yet, Plaintiff's use of the CEO title is not dispositive of actual authority. *See, e.g., Bauer v. United States*, 211 Ct. Cl. 276, 286 (1976) ("Mere office holding of and by itself does not render one responsible for the collection and paying over of employee withholding taxes."); *Heinmark v. United States*, 18 Cl. Ct. 15, 23 (1989) ("In the case at bar, plaintiff had a courtesy title, but no authority to control disbursements or voting stock."); *De Alto v. United States*, 40 Fed. Cl. 868, 875 (1998) ("The fact that a person is a corporate officer alone . . . is insufficient to hold a person responsible for the failure to pay trust-fund taxes."). Despite Plaintiff's title, it may be the case that he did not have the actual authority to pay the taxes owed.

Even though Plaintiff may have held the title of "CEO," the parties agree that Plaintiff did not have check-signing authority during the period in question. ECF No. 56 at 27; ECF

16

No. 62 at 20–21. While the "mechanical duties of signing checks and preparing tax returns are . . . not determinative of liability," *Godfrey*, 748 F.2d at 1575, "check-signing authority will be crucial to consider" in determining responsibility, *De Alto*, 40 Fed. Cl. at 876. Plaintiff offered ample evidence that he did not have check-signing authority, including providing copies of all paychecks from after INgage ended its contract with ADP, which were signed by either Claussen or Bacon. ECF No. 62-2 at 563–1362. The government argues that Plaintiff may not have signed any checks himself, but in Plaintiff's own words, "[d]isbursement of funds, that's typically done at a lower level . . . You don't see CEOs out there writing checks and disbursing funds." ECF No. 56 at 27 (alterations in original) (quoting ECF No. 56-4 at 66 (Pl. Dep. 251:18–22)). Yet, beyond check-signing authority, Plaintiff also provided evidence that to disburse funds, he required direction or approval from the board. For example, Plaintiff was determined to be unable to bind the company in settling a major lawsuit without the board's permission. ECF No. 62-2 at 143, 145, 148. Plaintiff further alleges that he could not contract with vendors or service providers for more than $100,000 without the board's permission, although he provides no evidence to support this claim. *Id.* ¶ 39. Despite Plaintiff's title, he did not possess check-signing authority and likewise has shown that he may have been limited by the board in his authority to make large disbursements of funds.

Furthermore, there remains an issue of material fact as to whether Plaintiff had actual authority over managing INgage's day-to-day finances. *See Godfrey*, 748 F.2d at 1576 (listing check-signing authority, day-to-day fiscal management, ability to pay creditors, control over voting stock, *inter alia*, as indicia of authority). The record shows that in his role, Plaintiff exercised some degree of apparent authority in managing the financial and daily affairs at INgage. *See* ECF No. 56-4 at 225 (CR Dep. 184:18–21), 260 (LB Dep. 84:24–85:4), 391 (GN Dep. 146:12–147:11); ECF No. 56-2 at 332. From firing employees to approving employee compensation and signing loan agreements on behalf of the company, Plaintiff exercised some degree of apparent authority over INgage's day-to-day finances. That said, what degree of autonomy he had in exercising that authority is unclear. Although he may have signed loan agreements on behalf of INgage that amounted to $4 million, ECF No. 56-4 at 466–549, and directed payments to specific employees and contractors, ECF No. 56-2 at 312, ECF No. 56-3 at 87–88, 89–90, whether those were decisions made at the behest of the board remains at issue.

Moreover, conflicting testimony from INgage employees and board members show that there is dispute over whether Plaintiff was viewed by others as having authority over INgage's finances, which is yet another indicium of authority. *See Neckles*, 579 F.2d at 940. Multiple board members and employees offer differing perspectives on whether they thought Plaintiff had final decision-making authority. Kolan and O'Brien affirm Plaintiff's claims that he had no actual authority, Shroeger undermines them, Richards seems agnostic, and Bacon does not comment one way or another. *Compare* ECF No. 62-3 at 128 (DK Dep. 39:13–22), *and id.* at 232 (MO Dep. 28:2–15), *with id.* at 307–08 (WS Dep. 140:25–141:8), *and* ECF No. 56-4 at 216 (CR Dep. 146:5–23). This difference in perspective could be simply vantage point—that those who worked under Plaintiff viewed him as a figure of authority, while board members understood the actual limits of his authority. It could likewise be attributed to time spent in the office working with Plaintiff, where those in the office understood his actual authority while those who merely came in for board meetings had a different impression. As such, the Court is

unable to conclude at this juncture that Plaintiff was even viewed internally at INgage has having actual authority.

Plaintiff's assertion that Claussen and Gunther were the parties with actual authority, while he only had apparent authority, creates a genuine dispute of material fact.  ECF No. 62 at 7, 6; ECF No. 62-1 ¶¶ 21, 22.  Although "'any' responsible persons, . . . not just . . . the person *most* responsible for the payment of the taxes," may still be held liable—such that all three individuals could be responsible people—the nature and structure of this business requires further fact-finding to determine what authority Plaintiff had independent from Claussen and Gunther.  *Jenkins*, 101 Fed. Cl. at 132.  The evidence before the Court on this issue is conflicting and thus inconclusive.  For example, Claussen or Bacon were responsible for signing all payroll checks after INgage ended their contract with ADP.  *See* ECF No. 62-2 at 563–1362, 229.  Yet, Plaintiff appears to have directed Bacon and others to pay specific employees, despite not physically signing the checks himself.  ECF No. 56-2 at 312–13, 316, 318; ECF No. 56-4 at 30 (Pl. Dep. 106:2–4).  Likewise, after the IRS began investigating INgage, Claussen and Bacon handled all direct communications with the agents.  ECF No. 62-4 at 489–637.  However, in an email from Plaintiff, he describes "mapping-out a plan of attack/offer" with INgage's attorney prior to a meeting with the IRS, despite not being present at the meeting.  *See* ECF No. 56-3 at 94.  Moreover, Plaintiff underscores that he was physically distant from the office, working instead from his home in California and traveling for business, while Claussen and Gunther were present in the Naples headquarters.  ECF No. 62-2 ¶¶ 22, 54–55, 57, 59, 72, 78, 86, 118.  But testimony conflicts as to whether Claussen and Gunther were present but ineffectual, while Plaintiff may have been distant but directing important aspects of the company's operations.  *Compare* ECF No. 56-4 at 295 (LB Dep. 223:22–224:15) (describing Claussen as present in the Naples office but uninvolved in daily operations), *and id.* at 198 (CR Dep. 74:5–75:11) (describing Gunther as a "cheerleader" who was occasionally present), *with* ECF No. 62-3 at 233 (MO Dep. 33:14–24) (describing Gunther and Claussen as "active in some of the day-to-day operations"), *and id.* at 301 (WS Dep. 105:6–25) (describing Claussen and Gunther as regularly present in the Naples office and overseeing daily operations).  Conversely, in one instance, Plaintiff unequivocally directed Bacon to pay the IRS for a portion of the trust fund taxes owed.  ECF No. 62-2 at 368.  But Plaintiff then directed Bacon to stop payment, saying that Claussen and Gunther directed Plaintiff to stop the payment prior to their meeting with an attorney.  *Id.*  These examples alone illustrate how Plaintiff's apparent authority may not have amounted to actual authority and vice-versa.  As such, the Court cannot find at this stage in the litigation, based on the totality of the evidence before it, that Plaintiff had "significant . . . control over the disbursal of funds," which was not abridged by Claussen and Gunther.  *Adams*, 504 F.2d at 75.

Because at the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," the Court cannot weigh the conflicting evidence before it regarding Plaintiff's authority to pay the trust fund taxes owed.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Contessa Food Prods. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . .").  Without the ability to weigh evidence, the Court cannot resolve the conflict between the evidence that both sides have presented.  For example, although

Kolan testified that Claussen and Gunther were often present in the Naples office and were heavily involved in daily operations, he admitted that he was rarely in the Naples office—he did not set foot in the office for the entirety of 2014—and seemed unsure how, exactly, he knew about Claussen and Gunther's involvement.  ECF No. 62-3 at 137, 120, 155–56.  *But see id.* at 159.  Likewise, Plaintiff's email to Bacon, in which he recounts that Claussen and Gunther told him to stop payment to the IRS, is merely Plaintiff's own statement from the time and is not presently supported by other facts in the record.  ECF No. 62-2 at 368.  At this stage, the Court must draw all reasonable factual inferences in favor of the nonmoving party, and as such, the evidence before the Court is sufficiently probative to meet Plaintiff's burden at the summary judgment stage.  *See Anderson*, 477 U.S. at 255.  At trial, however, the Court would be tasked with weighing the evidence before it, and the outcome of its findings could differ.

Although Plaintiff held the CEO title at INgage and had some level of apparent authority, a genuine dispute remains about what, as CEO, Plaintiff was allowed to or not allowed to do.  The record presents a genuine question as to what level of authority Plaintiff had over the control of INgage's finances and the scope of his decision-making power.  Therefore, whether Plaintiff was a responsible person, within the meaning of section 6672, is an issue for trial.

### 2.    Willfulness

The second requirement for liability until section 6672 is a showing that the taxpayer "willfully fail[ed] to collect [the] tax, or truthfully account for and pay over such tax, or willfully attempt[ed] in any manner to evade or defeat any such tax or the payment thereof."  26 U.S.C. § 6672(a).  Known as the willfulness requirement, this prong of section 6672 liability is met by showing that the person failed to remit the taxes owed in a "voluntary, conscious, or intentional, as opposed to accidental" manner.  *Howard v. United States*, 711 F.2d 729, 736 (5th Cir. 1983); *see also Feist*, 221 Ct. Cl. at 541 & nn.7, 8 (collecting cases); *Godfrey*, 748 F.2d at 1576–77.  The person "need not be motivated by bad intent to be willful."  *Howard*, 711 F.2d at 736.  "[R]eckless disregard of an 'obvious and known risk' that taxes might not be remitted" suffices to show willfulness.  *Godfrey*, 748 F.2d at 1577 (quoting *Feist*, 221 Ct. Cl. at 542).  However, "[m]ere negligence is not sufficient proof of willfulness."  *Feist*, 221 Ct. Cl. at 541–42.

A showing of willfulness may be made by putting forth "[e]vidence that the responsible person had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes."  *Olsen v. United States*, 952 F.2d 236, 240 (8th Cir. 1991); *see also Howard*, 711 F.2d at 736; *Mazo v. United States*, 591 F.2d 1151, 1157 (5th Cir. 1979) ("[E]vidence that the responsible person had knowledge of payments to other creditors after he was aware of the failure to pay withholding tax is sufficient for summary judgment on the question of willfulness"); *Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976) ("By dissipating the cash for new purchases, of which the taxpayers knew, they unwittingly supplied the necessary willfulness.").  In other words, meeting the willfulness requirement necessitates first, a showing that the taxpayer was aware of the delinquency, and second, a showing that the taxpayer favored paying other creditors over the IRS.  *See Godfrey*, 748 F.2d at 1577–78; *Powell v. United States*, 9 Cl. Ct. 58, 62 (1984) ("[W]illfulness may be shown by proving that the responsible person used available corporate money for other business purposes."); *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992) ("The 'intentional preference of other

creditors' over the United States is 'sufficient to establish the element of willfulness' under section 6672(a)." (quoting *United States v. Pomponio*, 635 F.2d 293, 298 n.5 (4th Cir. 1980)). Even when there is little or no money available to pay the taxes owed, the individual has a responsibility to "prorate such funds as are available between the Government and the employees." *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir. 1975); *see also Hochstein v. United States*, 900 F.2d 543, 548 (2d Cir. 1990); *Emshwiller v. United States*, 565 F.2d 1042, 1045–46 (8th Cir. 1977); *United States v. Gilbert*, 266 F.3d 1180, 1185 (9th Cir. 2001).

As discussed above, at issue for trial is whether Plaintiff was a responsible person—whether, as CEO, he had the actual authority to pay the taxes owed. However, the government has established—and Plaintiff failed to demonstrate that there is a genuine issue regarding—both that Plaintiff knew about the trust fund taxes owed and that he was aware of (and if he was a responsible person authorized) payments to other creditors instead of the IRS. The Court acknowledges that this is an uncommon holding in section 6672 cases. Most often, courts have held there to be sufficient evidence of both responsibility and willfulness. *See, e.g.*, *Howard*, 711 F.2d 729; *Mazo*, 591 F.2d 1151; *Olsen*, 952 F.2d 236; *Muck v. United States*, 3 F.3d 1378 (10th Cir. 1993); *Schiffmann v. United States*, 811 F.3d 519 (1st Cir. 2016); *Noffke*, 129 Fed. Cl. 341; *Waterhouse v. United States*, 122 Fed. Cl. 276 (2015); *Gonzalez v. United States*, No. 22-CV-3370, 2024 WL 4494099 (E.D.N.Y. Oct. 15, 2024); *United States v. Korangy*, No. 19-2641, 2021 WL 718938 (D. Md. Feb. 24, 2021). In several instances, courts have found that the government made a sufficient showing to grant summary judgment with respect to responsibility but not with respect to willfulness. *See, e.g., Feist*, 221 Ct. Cl. 531 (finding the taxpayer had no actual knowledge of the deficit); *O'Brien v. United States*, No. 07-CV-986, 2011 WL 855327 (D. Nev. Mar. 9, 2011) (holding that taxpayer likely did not have actual knowledge of the delinquency). In other instances, courts have refrained from even determining willfulness at summary judgment once they determined that the taxpayer was not responsible. *See, e.g., United States v. Fourrier*, No. 20-CA-244, 2021 WL 7184958 (W.D. Tex. Oct. 12, 2021). Finally, in one instance a judge of this Court declined to grant the government's motion for summary judgment on either issue, as there was a dispute over "the 'guidelines' for plaintiff's ability to make payments" and "the breadth of plaintiff's power to advise and recommend a course of action to the board—specifically, whether the board merely rubber-stamped plaintiff's recommendations or whether he had little power to make any real suggestions for payment." *Rosenheim v. United States*, 159 Fed. Cl. 559, 567 (2022). Although that case presented questions regarding the plaintiff's actual authority such that granting the government's motion for summary judgment with respect to responsibility was inappropriate, Judge Campbell-Smith never actually reached the issue of willfulness, so it is unclear what evidence of willfulness she had before her. *Id.* at 566. Here, although Plaintiff has sufficiently disputed whether he was responsible for the purposes of summary judgment, the same is not true of willfulness. Meanwhile, the government has made a replete showing of willfulness such that if Plaintiff were to be found responsible at trial, the Court would be required to find willfulness. Accordingly, the issue of willfulness can be decided at summary judgment.

With respect to willfulness, the Court first addresses Plaintiff's "aware[ness] of the failure to pay over withholding taxes," then turns to the Plaintiff's "knowledge of payments to other creditors, including employees" once he knew of the outstanding taxes. *Olsen*, 952 F.2d at 240.

### a. Awareness of unpaid taxes

The government has shown that Plaintiff was unequivocally aware of both the duty to remit the taxes owed and the fact that INgage was failing to remit taxes owed to the IRS.  The consequences of failing to remit trust fund taxes were spelled out in no uncertain terms in an email sent to Plaintiff in September 2012 from Nugent, who was responsible for overseeing the payroll.  ECF No. 56-1 at 38.  Plaintiff is correct that Nugent's email "*does not indicate that payroll taxes had not been paid*" and merely "describes circumstances that *could happen*."  ECF No. 62 at 28 (emphases in original).  However, emails from Bacon to Plaintiff from a few weeks later, on October 16, 2012, stating that INgage was behind on its August trust fund tax payments to the IRS, do "*indicate that payroll taxes had not been paid*."  *See* ECF No. 62-2 at 323–25, ¶ 70.  Not only do those emails show Plaintiff's awareness of INgage's unpaid taxes, but Plaintiff was also receiving nearly monthly emails from Bacon with cash amounts that, beginning in September 2012, included calculations of the payroll taxes owed broken out by quarter.  *See, e.g.*, ECF No. 56-3 at 16 & Ex. 87 (September 2012); ECF No. 56-1 at 45 & Ex. 23 (December 2012), 47 & Ex. 24 (January 2013), 49 & Ex. 25 (February 2013); ECF No. 56-3 at 33 & Ex. 97 (March 2013), 37 & Ex. 100 (mid-April 2013); ECF No. 56-1 at 69 & Ex. 28 (end of April 2013); ECF No. 56-3 at 39 (July 2013), 41 & Ex. 103 (September 2013); ECF No. 56-1 at 154 & Ex. 40 (early October 2013); ECF No. 56-3 at 44 (mid-October 2013); ECF No. 56-1 at 156 & Ex. 41 (November 2013), 158 & Ex. 42 (December 2013), 160 & Ex. 43 (January 2014).  The Court finds Plaintiff's responses to this evidence—that he struggled or neglected to open the documents in Microsoft Excel or that he was unaware of what "liabilities" meant—entirely unsupported by the evidence before it.  ECF No. 62 at 31; ECF No. 62-2 ¶ 73.  The government has made the required showing and Plaintiff has failed to rebut that as of the third and fourth fiscal quarters of 2012 Plaintiff was aware of both the duty to pay the taxes owed and of INgage's failure to remit those taxes.

Importantly, a plaintiff need not have actual knowledge of the unpaid taxes during the quarter at issue, but rather "[e]ven if a 'responsible person' is unaware that withholding taxes have gone unpaid in *past* quarters, it is settled law that a responsible person who *becomes* aware that taxes have gone unpaid in past quarters in which he was also a responsible person, is under a duty to use all 'unencumbered funds' available to the corporation to pay those back taxes." *Jenkins*, 101 Fed. Cl. at 135 (alterations and emphases in original) (quoting *United States v. Kim*, 111 F.3d 1351, 1357 (7th Cir. 1997)).  Therefore, even if Plaintiff only later became aware of outstanding payroll tax liability, as soon as he became aware of those liabilities and diverted funds elsewhere (discussed further below), he was willful in his nonpayment.

Beyond the last two quarters of 2012, Plaintiff admits that he was aware that INgage had failed to remit its trust fund taxes as of February 2013.  ECF No. 62-2 ¶ 75.  All parties agree that on February 19, 2013, Plaintiff presented to the board during its quarterly meeting, clearly stating that INgage was behind on the remittance of trust fund taxes from the third and fourth fiscal quarters of 2012, as well as for the first quarter of 2013.  ECF No. 56 at 13; ECF No. 62 at 3; *see also* ECF No. 56-4 at 44 (Pl. Dep. 163:8–25); ECF No. 62-2 ¶ 75; ECF No. 62-4 at 173, 108.  Plaintiff admits that as a result of his discovery of the amount of unpaid taxes, made in preparation for the February 2013 board meeting, his "personal risk antenna really rose, and [he]

went to the Board." ECF No. 56-4 at 44 (Pl. Dep. 163:5–6). Although testimony differs as to how the board reacted to the news, and whether it made payment of the taxes a top priority or a tertiary priority, there can be no doubt that at that point, Plaintiff was aware of the tax liabilities INgage had accrued. *Compare* ECF No. 62-2 ¶ 77 (Plaintiff alleging that the board made repaying payroll taxes the last priority to be paid with remaining funds), *with* ECF No. 62-4 at 672 (Gunther describing payroll taxes as the board's top priority). The evidence before the Court further suggests that Plaintiff did not vote at the board meeting, but that fact indicates Plaintiff may not have been a responsible person, not that he was unaware of the tax liability.

Nor does Plaintiff rebut the government's showing that he was aware of the outstanding trust fund taxes during the other fiscal quarters in question. Aside from the monthly cash summaries he received that reflected outstanding trust fund taxes, throughout 2013 and 2014, Bacon continuously emailed Plaintiff about the unpaid trust fund taxes. *See, e.g.*, ECF No. 56-1 at 71; ECF No. 62-4 at 39–42 (asking for guidance on paying Q3 2012 taxes and filing Form 941 returns); ECF No. 56-1 at 75; ECF No. 62-4 at 44 (asking for advice and listing the amounts owed for Q3 2012, Q4 2012, Q1 2013, and Q2 2013); ECF No. 56-2 at 355 (sending Plaintiff a record of two payments made to the IRS in 2013 to pay down part of the taxes accrued); ECF No. 62-2 at 461 (flagging the importance of paying current quarter, Q2 2013, "as soon as possible so that the IRS will be willing to work with us on the previous quarters"). Plaintiff declared that as of May 2014, he was fully aware that "INgage still had a significant outstanding payroll tax liability from the Q3 2012 through Q1 2014 quarterly periods," and he "recommended to the Board that it was important that those outstanding taxes be paid." ECF No. 62-2 ¶ 95. Around that time, Plaintiff was again reminded by Shroeger that "[f]ailure for the company to pay the Trust portion of the Liability . . . exposes the officers and directors to collection payments." ECF No. 56-3 at 52–53. As the government has met its burden, and Plaintiff has not made the requisite showing that he did not have knowledge of the unpaid trust fund taxes during any of the quarters in question, there is no genuine dispute over the issue of Plaintiff's awareness of the unpaid taxes.

### b. Payments to other creditors

A showing that a taxpayer was aware of outstanding trust fund taxes alone is insufficient to find that nonpayment was willful. The Court must also discern whether the taxpayer "had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes." *Olsen*, 952 F.2d at 240. The evidence before the Court makes plain that throughout 2012, 2013, and 2014, Plaintiff not only had knowledge of the outstanding taxes, but also had knowledge of payments to creditors other than the IRS and may have even directed such payments (depending on whether he had actual authority to authorize the payments he appears to have directed). Just fifteen days after Bacon emailed Plaintiff detailing INgage's payroll tax deficit from August 2012, Plaintiff appears to have approved awarding an employee a pay raise. *Contrast* ECF No. 62-2 at 323–25, *with* ECF No. 56-2 at 319. Throughout the quarters at issue, Plaintiff appears to have been regularly authorizing Bacon and Richards to pay particular employees special payroll distributions. ECF No. 56-4 at 225 (LB Dep. 183:6–184:21), 231–32 (CR Dep. 209:3–210:25); ECF No. 56-2 at 312–13; ECF No. 56-3 at 90–91. Plaintiff appears to have also been hiring new employees, ECF No. 56-4 at 40 (Pl. Dep. 148:20–21); authorizing the issuance of checks to creditors that were not the IRS, *id.* at 252 (LB Dep.

53:9–11), 253 (55:14–16), 265 (104:17–19, 105:3–5), 266 (106:4–6), 267 (110:20-22); and directing payments for INgage's operating expenses such as insurance and web hosting, ECF No. 56-3 at 31–33, 45; ECF No. 56-1 at 162–63.

It is beyond peradventure that Plaintiff was aware of these payments to other creditors. In fact, the evidence suggests that he authorized these payments. It is not entirely clear, however, whether he had the actual authority to authorize these payments, award pay raises, and hire new employees, or whether some other individual or the Board had the final authority in this area. That is the question for trial: Was Plaintiff a responsible person? At this stage, the Court determines that he was certainly aware of both the tax liability and the payments to other creditors. Accordingly, if Plaintiff cannot meet his burden at trial to demonstrate that he was not a responsible person, his willfulness will flow therefrom.

Although the government has made a requisite showing of willfulness, the taxpayer may rebut the government's proof of willfulness by affirmatively showing one of three things: that he was unaware that the taxes were not paid, that he lacked a reasonable opportunity to discover that the taxes were not paid and remedy the delinquency, or that he made reasonable efforts to pay the taxes owed. *DiStasio v. United States*, 22 Cl. Ct. 36, 48 (1990); *see also Feist*, 221 Cl. Cl. at 542. Here, Plaintiff argues that he was not aware of the tax delinquency until the February 2013 board meeting, rendering him not willful during the two quarters of 2012 at issue. ECF No. 62 at 32–35. What is more, after Plaintiff became aware of the delinquency in 2013, he claims that he prioritized remitting the payroll taxes owed. *Id.* at 37. He supports this argument by stating that "he never told anyone not to pay the IRS taxes that were due and never told anyone to pay a critical vendor, to pay employees, or to make other disbursements from INgage in advance of paying the IRS." *Id.* Plaintiff states that after the February 2013 board meeting, he "then believed the company was current through 2013 and 2014." *Id.* at 40; *see also* ECF No. 62-2 ¶ 60 ("I was not aware that payroll taxes were not being paid on a current basis after February 2013."). Yet somehow Plaintiff was sufficiently aware that INgage had outstanding payroll taxes because he refused to "officially" become CEO of INgage until 2016, at which time he felt assured that INgage was current on an installments agreement to pay some of the taxes owed. ECF No. 62 at 32–33. Essentially, Plaintiff argues he was unaware of the unpaid taxes until February 2013, and once he became aware, he believed them to have been immediately paid, but at the same time, he prioritized paying them and "never told anyone not to pay the IRS taxes that were due," which equates to making reasonable efforts to pay the taxes owed. A simple summary of Plaintiff's argument, notwithstanding the lack of any evidence cited to support these claims, makes clear that Plaintiff has not managed to meet his burden via any one of the three methods available to affirmatively show that he was not willful in his nonpayment of the taxes owed.

As such, the Court grants summary judgment with respect to willfulness. Left for trial is the sole issue of whether Plaintiff had the actual authority necessary to pay the taxes owed and thus was a responsible person.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES IN PART** the government's motion for summary judgment as to Plaintiff being a responsible person under 26 U.S.C. § 6672, and the Court **GRANTS IN PART** the government's motion for summary judgment as to willfulness, such that if Plaintiff is found to be responsible, then as a matter of law, he acted willfully in violating section 6672.  On or before **July 28, 2025**, the parties **SHALL** file a joint status report proposing a schedule for pretrial proceedings in accordance with Part VI of Appendix A of the Rules of the U.S. Court of Federal Claims.

**IT IS SO ORDERED.**

s/ Zachary N. Somers
Zachary N. Somers
Judge